IN THE MATTER OF THE LAST WILL OF LUCY FENTON, Deceased.

**Mental Capacity:** NON-EXPERTS. A stenographer who was for two hours engaged in taking testatrix' statements for deposition, and who testified that she hesitated in her answers, and was frequently prompted by another, could state, that, in his opinion, she was feeble minded.

SAME. On an issue as to testatrix' mental capacity, evidence of how she acted, when her mental condition was spoken of in her presence was admissible.

**Hypothetical Questions** touching mental soundness may include a statement that a person "would *keep* picking at her dress and continually peck on the arms of her chair," and "would not engage in any *conversation*," although the evidence does not show that she did these

things, continually and incessantly, and though it does not appear that she would not answer questions, and that she would not talk at all.

**Res Adjudicata:** TESTAMENTARY CAPACITY. One under guardianship for insanity, is *prima facie* incapable of making a will. On the other hand, while a charge, that a judgment removing a guardian and declaring a testatrix to be of sound mind, is not conclusive evidence of testamentary capacity, will not be interfered with where it is, if anything too favorable to appellant, the question whether such a judgment is even *prima facie* evidence of soundness of mind, in a will contest, is reserved.

**Harmless Error:** That a finding of undue influence in a will contest is unsupported, is not prejudicial where a finding that there was a lack of testamentary capacity, is sustained by the evidence.

*Appeal from Appanoose District Court.*—HON. W. D. TISDALE, Judge.

TUESDAY, FEBRUARY 4, 1896.

PROCEEDINGS for the probate of the will, with objections on the ground of undue influence, and that the testatrix was of unsound mind. The probate of the will was refused, and the proponent appealed.— *Affirmed.*

*Eichelberger & Taylor* for appellant.

*Payne & Sowers* and *George D. Porter* for appellees.

GRANGER, J.—The will of Lucy Fenton, deceased, was presented for probate, and upon objections being filed, the issues were tried to a jury, that returned a verdict for contestants. The sole legatee in the will, was one Mary E. Dooley, a daughter of the testatrix, who is the proponent. The contestants are grandchildren of the testatrix. The grounds of contest are that, because of age, bodily and mental infirmities, the testatrix was incapacitated to make a will, and that

the will was procured by fraud and undue influence of Mary Dooley and her husband. The jury returned special findings that the testatrix was not of sound mind, and also that the will was procured by undue influence.

I. This cause was tried in September, 1893. Some time prior to August, 1892, Lucy Fenton had been adjudged of unsound mind, and a guardian had been appointed for her. Thereafter, in a proceeding by her to have said guardian removed,-issues were made involving her soundness of mind, and upon the trial, in September, 1892, she was adjudged of sound mind, and relieved of guardianship. On the trial of this case, the testimony bearing on the soundness of mind of the testatrix, antedated the judgment setting aside the guardianship, and, after the close of the evidence for the contestants, the proponent put in evidence the record of the proceeding to set aside the guardianship, and then moved the court to strike out all the evidence with regard to the condition of the testatrix' mind prior to such adjudication, which motion the court overruled; and in its instruction to the jury, referring to such evidence, said: "Such records are only *prima facie* evidence of her mental condition at the time such proceedings were had, and not conclusive upon you in this case." This action of court is assigned as error, appellant's contention being that the adjudication of soundness of mind, is conclusive to the date of its entry. We do not find that the question has ever been passed upon in this state, and hence its determination is important. The question bears a close relation to adjudications resulting in judicial determinations of insanity, or unsoundness of mind. Appellant's claim is that the judgment is either conclusive of testatrix' mental capacity at the time of its entry, or of no effect at all. It is only necessary that we determine whether or not it

was conclusive; for, if of no effect, the holding of the court is not prejudicial to the appellant, but, on the other hand, to her advantage. The holdings are numerous to the effect that persons under guardianship are, *prima facie*, disqualified to make a will. *In re Johnson's Estate*, 57 Cal. 529; *Hamilton v. Hamilton*, 10 R. I. 538; *Brady v. McBride*, 39 N. J. Eq. 495; *Breed r. Pratt*, 18 Pick. 115; *In re Gangwere's Estate*, 14 Pa. St. 417; *McGinnis v. Com.*, 74 Pa. St. 245; *Lucas v. Parsons*, 23 Ga., 267; Woerner Adm'n., section 27; Schouler, Wills, sections 81, 82. In *Leonard v. Leonard*, 14 Pick. 280, in speaking of a person "*non compos mentis* under guardianship," where it is held that, as to a payment to the ward, by one knowing of the guardianship, it was conclusive evidence of an unsound mind of the ward, the court says: "We are of opinion that, as to most subjects, the decree of the probate court, so long as guardianship continues, is conclusive evidence of the disability of the ward, but that it is not conclusive as to all. For example, the ward, if, in fact, of sufficient capacity, may make a will; for this is an act which the guardian cannot do for him." In *Rice v. Rice*, 50 Mich. 448 (15 N. W. Rep. 545), the proceeding was for the probate of a will, and the objection was on the ground of the insanity of the testator, who was, shortly after the making of the will, and on the same day, adjudged "mentally incompetent to have the charge and management of his property," and placed under guardianship. The contestants contended that the order appointing a guardian was *prima facie* evidence of a want of capacity to make the will, and the court (Mr. Justice Cooley delivering the opinion) denied even the *prima facie* effect of such an order, but said that, if the proceeding for the guardianship had involved the question of testamentary capacity, such a rule would have obtained. That the question of testamentary capacity

was involved in the adjudication upon which the guardianship was revoked in this case, is, to say the least, doubtful. But it is not important that we should decide that, for the Michigan case is in line with the other authorities as to the *prima facie* effect of the guardianship. Against this conclusion is a line of authorities to the effect that a judgment can be nothing less than conclusive; that it can never be used "as tending to prove given facts." See Black, Judgm. section 505. The rule thus announced is a very general one, and obtains where the subject matter of the litigation and the parties are such as to invoke it. It is then binding upon parties and their privies, as contended by appellant. These undisputed and numerous authorities clearly recognize a distinction in these cases, and it is to be said that the facts to authorize or control the appointment of a guardian are not essentially, nor do we think they are generally, the same as those on which incapacity to make a will is based. The conditions of mind that would show a person incompetent to care for and preserve property, so as to authorize a guardian, might, in no sensible degree, show a condition of mind to incapacitate one for making a will. The two duties may require widely different considerations and capacities of mind and body. *Harrison v. Bishop,* 131 Ind. 161 (30 N. E. Rep. 1069), was a case where the only question involved was, "whether a person who has been adjudged to be a person of unsound mind, at any time, and for whom a guardian has been appointed, and as to whom such adjudication of mental unsoundness has never been set aside in the manner provided by statute, can, while such adjudication and guardianship exist, make a valid will devising real estate." In the opinion it is said: 'In our opinion, therefore, one's mental powers may be so far impaired as to incapacitate him from the active conduct of his estate, justifying the appointment

of a guardian for that purpose, and yet he may have such capacity as will enable him to direct a just and fair disposition of his estate." We think it may be safely said that the issues in this case are not such that the rule as to conclusive judgments can obtain. Under any authority known to us, and upon reason, the rule adopted by the court is not error against the appellant. We may reserve the question whether, in such a case, the record was available to show even *prima facie* soundness of mind.

II. There is something of a general complaint as to the admission of evidence showing the opinion of non-expert witnesses, based on facts disclosed by them as to the conduct and appearance of Mrs. Fenton. It is not important that we notice all the complaints in this respect. One is given in argument "as an illustration," and we notice it. A Mr. Davis, who was a stenographer, officiated at the taking of Mrs. Fenton's deposition, which consumed two hours. The following are his statements of fact, on the direct examination, on which the opinion was based: "Reside in Bloomfield, Iowa. Was present at Moulton, Iowa, September 5, when Mrs. Lucy Fenton's deposition was taken, and acted as shorthand reporter. Was two hours in taking the deposition. Mrs. Mary E. Dooley was sitting close to Mrs. Fenton most of the time, and conversed with her in an undertone five or six times. At that time Mr. Payne, one of the attorneys present, objected to Mrs. Dooley's talking with her mother while she was giving her testimony. Up to the time of the objection, Mrs. Dooley spoke to her almost every answer of importance. Mrs. Fenton would hesitate in answering before looking at Mrs. Dooley. How I happened to notice that, I was sitting at the table, and waiting for the answer, and seeing Mrs. Dooley have her mouth close to her mother's ear, and talking to her. I took the answer down in the

words which Mrs. Fenton used. Mrs. Dooley was look-
ing intently at her mother in the face. She hesitated
a good while before answering." The deposition was
taken a year before the trial of this case. The witness
was asked to state, from his observations of her at
that time, and her answers, conduct, and actions,
whether or not, in his opinion, she was of sound mind.
His answer was: "I think she was feeble-minded." It
comes within the rule of the *Norman Case*, 72 Iowa, 84
(33 N. W. Rep. 374), and *State v. Winter*, 72 Iowa, 627
(34 N. W. Rep. 475). The witness here observed her
conversation, actions, and manner, for two hours,
under circumstances to indicate her condition as to
mental capacity. The situation was such as to afford
something of a practical test as to her strength of
mind and memory. C. E. Fenton, a son of the testa-
trix, was a witness, and was asked to state any occas-
ion when his father said anything in the presence of
his mother in regard to her mental condition, and
he said: "Well, there are several times that I
cannot bring to memory. I will commence with
one that I do remember. It was just a while before
they moved her from the old homestead. Father says:
'We are going to Moulton. Mother is going, and I
am going along with her, for you know her mind is
not right; and I am going along and stay with her.'"
He was then asked to state what effect such state-
ments had on his mother. He answered that they had
no effect that he could discover. There was no error
in the admission of such evidence. It was proper for
the jury, in fixing upon her condition of mind, to know
how she was affected by such a statement made in her
presence. We can all appreciate how persons of sound
mind would accept such a statement, made as to them.
Some of the witnesses were permitted to state, against
objection, when they heard of Mrs. Fenton's death.
There was no error in this, although it could not well

bear upon the issue as to capacity. It was an incidental fact, such as are disclosed in nearly all trials and entirely harmless. Such a latitude, in the discretion of the court, is permissible. In one of the cases, the question seems to have been asked in connection with the time when the witness last saw Mrs. Fenton alive. It is not necessary to follow these complaints further. In some cases no exceptions were taken, and in none do we see reversible error.

III.  A somewhat extended hypothetical question was asked the experts, and complaint is made of it, because it had not support in the evidence. It recites facts as to Mrs. Fenton's physical and mental condition, as that she was eighty-four years of age; that in her early married life she was cheerful and sociable; that her family relations were pleasant; that about fifteen years since she was known for the first time to be melancholy—claimed that her neighbors had turned against her; that her memory began failing some nine or ten years before; that she had fainting spells and epileptoid attacks; did not recognize her grand-children; her pulse ran down to thirty or forty; that her arteries were hardened, conflicting with her heart's action, and that this continued in progressive degrees until five years before her death, gradually growing worse, and three and one-half years before her death she had severe sinking spells, and would become unconscious from five minutes to an hour; that she could do no work, and could only get around with assistance of others; would forget where she placed things around the house but a few minutes before; would keep picking at her dress, and continuously peck on the arms of her chair where she was sitting, or on the stove; would not engage in any conversation, but appeared to be in a study; was morose and melancholy, and would accuse members of the family, without cause, of stealing; was confined mostly

to her bed, and constantly growing weaker and emaciated; that she suffered more or less from disease and illusions; and that her physical condition with respect to feebleness constantly grew worse. The physicians, as experts, were asked to state, from such facts, the condition of her mind, as to being sound or unsound. It is said, in argument, that there was no evidence that she "continuously kept picking at her dress or arm of her chair, or on a stove." The argument is a slight misapprehension of the question. The question is, not that she continuously kept picking at her dress, but that she would keep picking at her dress, and continuously peck on the arm of her chair. In view of the claims in argument, the distinction is somewhat important. The argment assumes the question to mean that she kept doing the thing continuously, without stopping. With that view, the fact is without support in the evidence. But the statement that she would "keep picking her dress" does not convey that idea. As used. such a statement means the doing of the thing for so much of the time as to be unusual. To no one would it convey the idea of being literally continuous. The same may be said of her continuously pecking at the arm of her chair, or the stove. The thought is, not that she did so at all times, but that she did it as a habit or unusually. As thus understood, the facts have support in the testimony. To the part of the question that she "would not engage in any conversation, but appeared to be in a study," it is said that there is no evidence to show that she would not engage in any conversation. It is true that she would answer questions, and talk some, but the term "conversation" means more. It means familiar intercourse—an exchange of thoughts or sentiments; and that is evidently the import of the word

in the question.   The question in this respect is not faulty.

IV.   At the close of the testimony the proponent asked the court to withdraw from the jury the issue as to undue influence, on the ground that it was entirely without support in the evidence, which the court refused, and complaint is made of the ruling. It will be remembered that the jury found for the contestants, both as to the want of capacity and undue influence.   If the finding as to either has support, the cause could not be reversed on the evidence.   Not saying that we agree with appellant as to the evidence on the question of undue influence, it is sufficient for us to say that we are so well satisfied with the evidence to support the finding that Mrs. Fenton was not of sufficient mental capacity to make a will, that we need not consider the other question.   The hypothetical question, somewhat fully set out, indicates the facts having support in the evidence, and the verdict as to a want of capacity is well sustained.   The judgment is AFFIRMED.